MARY HELEN AITCHISON, Appellant, v. WILLIAM E. AITCHISON.

| 99 | 93 |
| 110 | 201 |
| 99 | 93 |
| d116 | 490 |
| 99 | 93 |
| 121 | 510 |
| 99 | 93 |
| 129 | 195 |
| 99 | 93 |
| 133 | 23 |
| 99 | 93 |
| 141 | 195 |

**Divorce:** ADULTERY: *Evidence.* In an action by a wife for a divorce on the grounds of adultery, it appeared that the parties had been living unhappily together; that a separation was probable; that defendant, having arranged a meeting in another town with one H, an unmarried woman, to whom he had formerly been engaged, left his home on Saturday, registered at a hotel in the town selected, and procured a room adjoining his own for H, who arrived the next morning; that defendant and H were seen several times on Sunday sitting together, holding hands; that one of the servants saw defendant sitting on the bed with his arm around the waist of H, and that they were again seen in a similar position; that on Monday evening defendant paid the hotel bills of both, and accompanied H to the train, where he kissed her goodbye; that plaintiff afterwards found a telegram to defendant, dated the day after he and H left the hotel, which read: "Here safely. Tired out. Served well last night. Fancy past two days. Will write to-day." Defendant and H both denied the charge of adultery. *Held,* that the circumstances were insufficient to sustain the charge of adultery.

ROTHROCK, C. J , dissenting.

SAME   A divorce on the grounds of adultery will not be granted upon evidence of a meeting between defendant and one to whom he had been engaged before his marriage to plaintiff, where the evidence of such meeting is consistent with the theory that defendant

sought such meeting for the purpose of renewing his friendship with her, after it became apparent to him that a separation from his wife was probable, and that a divorce would be likely to follow.

CIRCUMSTANTIAL EVIDENCE.    The evidence to'authorize a divorce on the ground of adultery need not be direct, but if circumstantial, the circumstances must be such as would lead the guarded discretion of a just mind to the conclusion of the truth of the facts.

CRUEL TREATMENT: *Evidence.* Under Code, section 2213, paragraph 5, allowing a wife a divorce when the husband is guilty of such inhuman treatment as to endanger her life, any treatment calculated to affect the mind of the wife so as to endanger her health, and ultimately endanger her life, or which involves, by natural consequences, a permanently injurious and prejudicial effect on her health, perilous to life, is sufficient

SAME.    There was evidence that defendant was in the habit of absenting himself in the evening from home and the society of plaintiff, his wife, who was in ill health; that he was neglectful of his children and harsh in his language; that he often did and said things that caused his wife distress; that on two occasions he called her a liar, and told her his friends wondered why he married her, and that they thought it must have been for money; that once, after having requested his wife not to buy from his merchant on credit until he had paid what he already owed, defendant threatened, on learning that she had purchased certain necessaries, for which she had no money to pay, to tell the merchant to refuse her credit; that plaintiff had found certain telegrams which aroused her suspicion, and led to her finding out that defendant and an unmarried woman, to whom he had formerly been engaged, had staid at the same hotel for two days, occupying adjoining rooms, and conducting themselves as lovers. *H'ld*, that defendants acts justified a decree of divorce for inhuman treatment.

CUSTODY OF CHILDREN.    In granting a divorce to a wife on the ground of cruelty, the custody of two boys, aged four and five, respectively, should be given to the wife, on a showing that she will be able to keep them with her at the home of her parents, and that such home is a suitable place.

ALIMONY.    In granting a divorce to a wife on the grounds of cruelty, seven hundred and fifty dollars per annum, payable quarterly, is a proper allowance, when the plaintiff is given the custody of two children, aged four and five, respectively, and defendant is a competent business man, earning one thousand five hundred dollars a year.

*Appeal from Pottawattamie District Court.*—HON. N. W. MACY, Judge.

MONDAY, OCTOBER 12, 1896.

ACTION for divorce and for alimony, and the custody of the two minor children of these parties. The causes for divorce alleged are inhuman treatment, such as to endanger the life of the plaintiff, and adultery. Defendant answered, denying both of these charges, and a decree was rendered dismissing the plaintiff's petition, from which decree she appealed.— *Reversed.*

*Ross & Ross* for appellant.

*Sims & Bainbridge* for appellee.

GIVEN, J.—I. These parties—young, intelligent, educated, of good habits, and highly esteemed by their acquaintances—were married on January 30, 1890. Their surroundings gave promise of a happy married life, yet since April 20, 1894, they have lived apart from each other, and the plaintiff is now demanding a divorce upon the grounds already stated. We are not to determine which of these parties is at fault, or most at fault, in bringing about this unfortunate estrangement that has arisen between them. We are to determine from the evidence whether either or both of the causes for divorce alleged are established, and we first consider the charge of adultery. Plaintiff alleges that on February 4 or 5, 1894, in the city of Marshalltown, Iowa, the defendant did commit adultery with one Miss Howe, and this charge the defendant denies. Adultery is the voluntary sexual intercourse of a married person with one not the husband or wife. 1 Bishop Mar. & Div. 1502. This

charge can seldom be proven by other than circumstantial evidence, and evidence thereof is sufficient when the circumstances proven lead naturally and fairly to the conclusion of guilt, and are inconsistent with any rational theory of innocence. *Names v. Names*, 67 Iowa, 383 (25 N. W. Rep. 671). To support this charge it is not necessary to prove the direct fact of adultery, but it may be inferred from the circumstances. The circumstances must be such as would lead the guarded discretion of a just mind to the conclusion of the truth of the facts. "If the adulterous disposition of the parties is once established, the crime may be proven by their afterwards being together under circumstances authorizing such an inference." *Inskeep v. Inskeep*, 5 Iowa, 204. There is no direct evidence to sustain this charge. The circumstances from which we are asked to infer guilt are the then existing relations between these parties, the prior relations between the defendant and Miss Howe, their meeting at Marshalltown, and their conduct towards each other while there. The facts touching these matters are substantially as follows:

Differences had arisen between the defendant and his wife long prior to February 4, 1894. They had several times passed weeks together in their own home without speaking to each other. Defendant had made the acquaintance of Miss Howe in Madison, Wis., in 1882, while he was attending college, and they had become engaged to be married. Plaintiff testifies, without contradiction, that at one time her husband told her of this engagement; that Miss Howe had broken the engagement; that he had a serious trouble with his best friend because of the engagement, his friend not thinking Miss Howe worthy of him; and that defendant expressed his satisfaction that the engagement was broken. Prior to

February 4, 1894, defendant, then residing at Council
Bluffs, Iowa, and Miss Howe, residing at Madison, Wis.,
arranged by correspondence, to meet at Marshalltown,
on the fourth of February, 1894. On February 3, 1894,
defendant left his home, without informing the plaint-
iff that he was going, but telling the hired woman to
inform Mrs. Aitchison that he would be back on Mon-
day. He went directly to Marshalltown, where he
stopped at the Pilgrim Hotel, registering his own
name, and was assigned to room 58. When he arrived
he told the clerk that he expected a lady friend next
morning, whom he had not seen for a long time, and
that he had a good deal of talking to do, and asked to
have a private parlor. He was told that there was no
private parlor, but that the lady could be given a room
close to his. Defendant said he expected the lady at
7:05 in the morning, and left an order to be called.
He was called, and went to the train, met Miss Howe,
returned with her to the hotel, and registered her
name, "Miss Howe, Madison, Wis." Miss Howe was
assigned to room 60, adjoining that occupied by the
defendant, both opening into the same hall, but with-
out any inside communication. We have none of the
letters before us by which this meeting was arranged,
but we have the following telegrams, dated at Madison,
Wis., February 2, 1894, which Miss Howe testifies she
sent to defendant: "To Minneapolis to-night. Address
E. Thirteenth street. Marshalltown Saturday evening
sure. What hotel at Marshalltown? Wire me." "Plans
changed. Marshalltown Sunday morning from Chicago,
over C. & N. W. R. R. Wire here. Leave here Sat-
urday P. M." Plaintiff introduced in evidence a dis-
patch to defendant at Council Bluffs, dated at Clinton,
Iowa, February 6, 1894, as follows: "Here safely.
Tired out. Served well last night. Fancy past two
days. Will write to-day." Miss Howe admits sending
a dispatch from Clinton, but denies that it was in the

language quoted. Defendant returned to his home on February 6, and this telegram from Clinton, the plaintiff found upon the floor of their room, where defendant had set his satchel. We are inclined to the belief that the telegram from Clinton was in the language quoted above. On Monday evening, February 5, the defendant and Miss Howe left the Hotel together, he having paid the hotel bill for both. He took a train for the west, and she one for the east, at 11:45 P. M. The rooms occupied by these persons were on the third floor, fronting on a rather dark hall, and without any inside communication. The balcony overlooking the hotel office was on the second floor. The double parlors, separated by folding doors, were also on the second floor. The evidence touching the conduct of defendant and Miss Howe while at the hotel is, in substance, as follows:

Mr. Edwards, clerk of the hotel, testifies as to the arrival, registering, and departure of the defendant and Miss Howe, as already stated. He says: "I saw them quite often on the balcony. Always together when I saw them. I am not up in the halls. I don't know how much they might have been together. Every time I saw them they were together. They came to their meals together; came into the dining room, sat together." He states that on Monday evening Mr. Bell, of Council Bluffs, registered for lodging; that while sitting in the office, they observed the defendant and Miss Howe come onto the balcony; and that Bell informed him that the defendant was a married man. He testifies that Mr. Bell, being an architect, and desiring to look through the hotel, which was a new one, he went to show him around. "I went to show him the back parlor, and ran onto these folks sitting on the settee there. I excused myself, but did not light the light. The parlor was a double parlor, with folding doors between." This witness being

asked, "In their conduct towards each other, what did you observe peculiar, if anything?" Answered as fol-lows: "Well, nothing. They were together a good deal. The only thing I noticed that I thought very much out of order was sitting in the back parlor, where there was no light. He asked for a private par-lor. I told him we did not have any. They were in the back parlor, and had closed the folding doors."

Mr. Barnhart, proprietor of the hotel, testified that there was no watch kept on the third floor; that it was possible for a guest to pass by the hall, from one room to another, without being seen. He says: "About 9 o'clock Sunday morning I was passing along the third floor hall, and looked into the room 60, occupied by Miss Howe, and I saw Mr. Aitchison sit-ting in the doorway. I went to the chambermaid on that same floor, and instructed her that if the door of No. 60 was closed, and she had any reason to think that the gentleman was inside, to call the office at once. This chambermaid was Miss Lettie Burris. At about 10 o'clock on Sunday they came down to the public parlor. I saw them frequently during all of Sunday, either in the main parlor or in the gallery. They sat most of the day in the corner of the gallery. I saw them again at night, between 8 and 9 o'clock, in the back parlor. At that time there was a light in the front parlor, and on going back into the back par-lor I saw them sitting very close together on a small sofa, and I immediately turned on the electric light in the back parlor, and turned round and walked out. At that time A. G. Edwards was night clerk, and is now in my employ as day clerk. Webb Lively was day porter, but is not now in my employ. Harry Barnhart was day clerk." Cross-examination: "The conduct of these parties appeared to be that of lovers. They were together all the time during the day, and acted like two people would who were expecting to

be married. They seemed to be fond of each other. When I went into the back parlor he was sitting very close to her, holding one of her hands in his. When I went in the back parlor and saw them sitting on the settee, it wasn't very dark. Light from the main parlor lit up a certain portion of the back parlor, so that any one could be seen readily by going to the door of the back parlor. I did not know they were in there when I went into the back parlor. I went in to examine the lights. They did not seem confused, and not at all embarrassed. There was not a word said. I turned the light on, and went out. The door between the two parlors was open when I went in. I would not have thought of going in there if I hadn't seen the door open, and walked on through. When I saw them sitting there I turned the lights on, because I don't allow any one to sit that way, so as to excite suspicion."

Lettie Burris, employed as chambermaid, testifies that she saw these persons on Sunday morning in the same room. "They were sitting on chairs close together, and he was holding her hand. * * * As I passed along there that Sunday the door was wide open, I think. They occupied separate chairs. It was half past 10 or 11 o'clock. They were in room 60. After that time I did not see them to notice them. Mrs. Barnhart was with me."

Mr. Bell testified to seeing the defendant and some lady sitting together on the balcony Monday evening; that about train time they went to their rooms, as he supposed, to get their baggage, returned to the balcony, and went into the parlors, sat awhile, and then went to the train. He testifies to going into the parlors with Mr. Edwards, and seeing these persons. He says: "There was no light in this parlor, but the door between the parlors was not closed. * * * The door was open between the two parlors.

One light was turned on in the main parlor, and an arc light was burning in the balcony."

Webb Lively, a colored man, employed as janitor and train caller at the hotel, testifies, that he showed the defendant to his room on his arrival, and waited on him with water, etc. He says: "He had such a pretty nightshirt; I asked him about it. I said: 'That is the prettiest nightshirt I ever saw.' He says: 'I have got to have these things. I expect a very dear lady friend.' I didn't ask who." Being asked whether he saw these persons in the same room, together, he answered: "Yes, sir; I saw them in room 58 together, alone, Sunday, but I do not remember what time,— whether evening or morning. I think it was when I went to call them to dinner. He was sitting on the bed. She was standing right in front of him, and he had one hand around her waist. I never noticed where the other hand was. That was in his room." He also testified that he saw them again, "once in room 60, the same day. While passing the room I saw them. He was sitting on the cane-bottomed chair, a big chair, and she was sitting right on the arm, like this, she talking. It was in room 60, as I was passing. The door was open just a crack. He had his arm around her waist, and she had her arm around his shoulder." He also testifies, that at the depot they kissed and said goodbye. She got onto the train, and he got on too. He states on cross-examination, that he thinks he had gone to call them to dinner at the time he saw them in room 58, because of some of the wires being displaced so that the bells would not ring, that the door was ajar over a foot, and that they could not readily be seen from the hallway, unless a person would stop. He also states: "Both were dressed. I noticed no disarrangement. She was just standing. Their heads were close together. I never heard a word."

The defendant and Miss Howe were examined as witnesses, and neither deny any of these statements as to their conduct at the hotel, except the statement of Webb Lively as to the conversation with the defendant about the nightshirt. The defendant says: "I am not in the habit of taking colored porters in a hotel into my confidence. No, I did not have any such conversation. I did not say anything to the colored porter about my undershirt, underwear, or clothing, in any way." Miss Howe was not asked to, nor did she give any reason for this meeting with the defendant. In response to an interrogatory she answered: "There has been no such intercourse as alleged between W. E. Aitchison and myself at Marshalltown, Iowa, at the time named, or at any other time or place." The defendant testifies: "There is no truth in the statement that I committed adultery in Marshalltown, Iowa, on February 4 or 5, with a woman registered at the Pilgrim Hotel in said city as Miss Howe. It is entirely false." The only reason given for this meeting at Marshalltown is in the defendant's evidence, which is as follows: Ques. "I didn't ask you before, but will now, Mr. Aitchison, why was it you went to Marshalltown? Ans. I went to see and talk with Miss Howe. Ques. Why did you want to talk with her in preference to your mother, or some other person? Ans. Because they were matters with which I could go with difficulty. Ques. What matters? Ans. The matters I had to talk over. Ques. Well, what were they? Ans. They were with reference to the unsatisfactory condition of my family relations. Ques. Is that all? Ans. Yes, sir. Ques. Did the lady know what you were going to talk with her about? Ans. No, sir. Ques. Is that the only reason you had for going there? Ans. I wished to see her as a matter of old friendship. And I had never learned why our engagement had been broken. I had

a curiosity to learn that. Ques. Well, that was the only reason you had—your family difficulties, no others—you say? Ans. Yes, none except she was a friend in whose judgment I could rely. Ques. What is the fact? Did you talk over your family difficulties with her when you were there? Ans. I did; yes, sir. Ques. And consulted with her about it? Ans. Yes, sir. Ques. And did you get her advice? Did she offer any? Ans. Yes, sir; she did offer me advice. Ques. As to what? Ans. As to my family difficulties —as to the way they should be settled. She advised me to go home, and do everything in my power to make my wife's life happy."

This meeting, viewed in the light of the facts, was, to say the least, most extraordinary, foolish, and without justification or excuse. To justify us in saying that these persons were guilty of adultery, the circumstances must not only lead naturally to that conclusion, but must exclude every rational theory of innocence. The reasons given by the defendant for that meeting are not consistent with the facts, nor with the way people usually act. There is a rational theory, fairly deducible from the facts, which we think explains this meeting consistently with innocence. As will be seen hereafter, differences had arisen between defendant and his wife. They were living unhappily together, and separation had been threatened. As early as September, 1893, defendant sought to visit Miss Howe, and soon thereafter correspondence was renewed between them. It is evident that defendant's affection for his wife had grown cold, and his affections for Miss Howe revived, and in this may be found an explanation of much of his conduct towards his wife. At the time this meeting was planned it was apparent that a separation between defendant and his wife was probable, and that a divorce was likely to follow. Blamable as it was,

we think the defendant sought this meeting for the purpose of renewing his friendship with Miss Howe. True it is, that neither say such was their purpose, but we think it is reasonable, and fairly deducible from the facts. Their conduct was consistent with this rational theory of innocence, and precludes the conclusion that defendant was guilty of adultery.

II. Section 2223 of the Code, in specifying the causes for which divorces may be decreed, provides as follows: "When he is guilty of such inhuman treatment as to endanger the life of his wife." To constitute inhuman treatment, within the statutory sense, it must not only be inhuman, but such as to "endanger life." *Freerking v. Freerking*, 19 Iowa, 34; *Knight v. Knight*, 31 Iowa, 451. The acts must be such as to justify a belief that the continuance of cohabitation would be dangerous to her health and life. *Vanduzer v. Vanduzer*, 70 Iowa, 614 (31 N. W. Rep. 956). Plaintiff specifies six particulars wherein it is claimed that defendant's treatment of her was inhuman, and such as to endanger her life. They may be summarized as follows: (1) That he habitually spent his evenings away from home until a late hour. (2) That he was careless and negligent of plaintiff when sick, in that on one occasion, finding in her sick room some whisky, which had been prescribed for her, he drank of the same in her presence, thereby disturbing her in her then condition, and on another occasion neglected to call a physician to attend her. (3) That on one occasion, in her presence, and against her protests, he angrily and violently crushed their infant child to his breast. (4) That in May, 1893, and in February, 1894, he shook his clenched fist in plaintiff's face, in an angry and threatening manner, and called her a liar. (5) That, when presented with a bill for necessary clothing purchased by plaintiff for herself and her children, he informed the plaintiff that if her acts

were repeated he would see that no further credits were extended to her. (6) That during the winter and early spring of 1894, he failed to supply fuel suitable in quality and quantity to keep plaintiff and her children in reasonable safety and comfort. There is evidence tending to sustain these complaints, and, in searching for the cause of defendant's conduct in these particulars, it is to be found in the fact that, owing to temperament and impaired health, she was somewhat nervous, peevish, and disposed to complain and to exact full confidence and free communication from the defendant concerning his business and social affairs. He, on the other hand, was reserved as to these relations, and rather sullen and dictatorial towards his wife. A more satisfactory explanation is in the fact that his affections for his wife had become cold and estranged. It is undoubtedly true that defendant's habit was to absent himself from home and the society of his wife of evenings, but this is explained in part by the fact that his employment required him to work at nights. It is also explained, in part, by the fact that, because of the estrangement that existed, he found it more agreeable to spend his evenings with his whist club than in the company of his family. As to his drinking whisky in her presence when ill, the fact appears to be that on coming into her sick room he observed a bottle of whisky that had been sent in by a neighbor for her use, and which was said to be old and of superior quality. He took the bottle and tasted of it in her presence, against which she protested. It is not claimed that the defendant was addicted to the use of strong drinks, nor that he intended to more than taste of the liquor. What he did was because of what had been said about the liquor, and not with any desire to vex or worry his wife; and it does not appear that any bad consequences resulted to her from his conduct, and the matter

was passed over at the time as of no consequence. The facts concerning the alleged abuse of the child seems to be that defendant was in bed with the child in his arms. The child was fretful, crying, when he, with some impatience, pressed the child to his breast, which caused it to cry the more, whereupon plaintiff and her parents interfered with somewhat more excitement than prudence. It does not appear that the defendant intended to do, or did, any injury to the child, or gave any reason for apprehending that he would do so, but his conduct was no doubt very distressing to his wife. Plaintiff shows in her evidence that on two occasions, when they were disputing, and when she was charging him with having done as he should not, he, being provoked and angry, called her a liar. On one of these occasions he said to her, angrily, that his friends wondered what he had married her for; that they thought it must have been for money, and not for good looks, character, integrity, or any of these qualities. This conduct the defendant does not deny, and we do not discover that there was any justification for it. Defendant found himself indebted to his merchant in an amount larger than he could pay at the time, and he requested his wife not to increase the bill until he could pay what he then owed. In a few days, she purchased on his credit some articles of clothing needed by herself and children. When reminded of his request, she told him that, if he could not provide her with the necessaries of life, she would leave him and go to her parents, whereupon he says: "I told her, that if it became necessary,—if she so openly disregarded my wishes in this matter, when I had such good reasons,—that I would tell Messrs. Beno & Co., that they must extend her no more credit on my account." The facts concerning the alleged failure to furnish fuel, are these: A change had been made in

the heating stoves, from coal to wood, and the complaint is, that defendant did not furnish wood "suitable in quality and quantity." There is a dispute as to the quantity of wood furnished, but we are inclined to think, that there was no deficiency in quantity, but that the wood furnished was not of proper lengths for use in the stove in the family chamber. Plaintiff, regarding it as improper to use the family chamber without proper fuel, took her children and went to her father's home, as she had frequently done before, on occasions, when she thought that her husband was acting improperly. We will not extend this opinion by here noticing other instances of misconduct on the part of the defendant toward his wife. The evidence shows, that from the time the differences arose between them, he was continually neglectful of his social duties to his family; was not helpful in caring for the children; was sullen; reserved in his communications with his wife; harsh in his language when angry; not at all thoughtful as to the health and comfort of his wife, as he should have been; and exacting and dictatorial.

III. Treatment calculated to affect the mind of plaintiff so as to destroy her health and ultimately endanger her life, or which involves, by natural consequences, a permanently injurious and prejudicial effect upon her health, perilous to life, will be sufficient. *Caruthers v. Caruthers*, 13 Iowa, 266; *Cole v. Cole*, 23 Iowa, 433; *Day v. Day*, 84 Iowa, 221 (50 N. W. Rep. 979). We do not think that conduct on the part of the defendant such as that shown above would, aside from his conduct with Miss Howe, endanger the life of the plaintiff, but the effect of such conduct must be viewed in the light of attending circumstances. By accidentally finding the telegrams from Miss Howe, the plaintiff's suspicions were aroused, and she instituted investigations which discovered to

her the facts touching the Marshalltown meeting, and the fact that she no longer held the affections of her husband. We are satisfied that to require her to continue to cohabit with the defendant under these circumstances, and to be subjected to such treatment as that shown above would, in view of her physical condition, destroy her health, and ultimately endanger her life. We think the facts bring the case within the rule announced in *Vanduzer v. Vanduzer, supra,* quoted above, and that a decree of divorce should be entered in favor of the plaintiff.

IV. Each party asks the custody of their two children, aged, respectively, four and five years. Plaintiff shows that, by the consent of her parents, she will be able to keep the boys with her in the home of her parents. Defendant denies that it is a suitable place in which to rear the children, and alleges that he expects to provide a home for himself and his mother, and that he desires to keep the children with him in his home. We are satisfied that the home of the plaintiff's parents is a suitable place in which to rear the children, and that, in view of their ages, they should be left in the care and custody of their mother. Plaintiff asks alimony, to be paid quarterly. It is conceded that defendant is a competent business man, and is receiving a salary of one thousand five hundred dollars a year. Decree will be entered in favor of the plaintiff for seven hundred and fifty dollars per annum alimony, payable quarterly, at the end of the quarter. The decree as to the custody of the children, and as to the amount of alimony, will be subject to review by the district court, on the motion of either party, on twenty days' notice thereof to the other party. The decree of the district court is reversed, and the case will be remanded for a decree, in conformity with this opinion.—REVERSED.

ROTHROCK, C. J.—I concur in the result, but dissent from the conclusions of the majority on the first point in the opinion.