STATE OF IOWA, Appellee, v. JACOB RUPERT GARDNER, Appellant.

**ADULTERY:** Evidence—Sufficiency. Evidence held insufficient to sustain a verdict of guilty of adultery.

**ADULTERY:** Evidence—Files in Divorce Proceedings. The files in divorce proceedings brought by the wife subsequent to the alleged

adultery are admissible for the purpose of showing that the prosecutor—the husband—did not mention or otherwise utilize the defense of adultery in the said action by the wife.

*Appeal from Winneshiek District Court.*—JAMES D. COONEY, Judge.

DECEMBER 11, 1924.

DEFENDANT was indicted, tried, and convicted of the crime of adultery, and sentenced to the penitentiary at Fort Madison not exceeding three years. He appeals.—*Reversed.*

*McCook & Lyons, E. R. Acres,* and *F. A. O'Connor,* for appellant.

*Ben J. Gibson,* Attorney-general, *J. A. Nelson,* County Attorney, and *Frank Sayre,* for appellee.

PRESTON, J.—A number of errors are assigned by appellant, among them that the evidence is not sufficient to justify a conviction. It is also contended that there was misconduct in argument by the county attorney, and that the verdict is the result of passion and prejudice.

1. ADULTERY: evidence: sufficiency.

There is some complaint of the instructions and rulings of the court upon the admission and exclusion of evidence.

The alleged adultery is said to have been committed October 17, 1923, with Ida May Miller, the wife of Curtis Miller. Defendant is 40 years of age, a farmer, living on a 200-acre farm, on which he has lived all his life. His wife died in March, 1923, leaving two small children. The defendant continued to live on the farm with one of the children, a housekeeper, and hired men. One of the children lived with defendant's sister. The prosecuting witness, Curtis Miller, and his wife, on the date in question, were living on a farm about half a mile west of defendant's farm, on the same road. They had lived there for 20 years. The dwellings are described, as to doors, windows, location with reference to the highway, etc. The families neighbored back and forth; and after Mrs. Gardner's death, the

. neighboring continued, each borrowing articles from the other. In August, defendant brought his baby to the Miller place, visited with the threshers for a time, and was in the Miller house with the baby. Miller testifies that, at the time he went into the basement to get a can of gasoline, he heard people on the floor above, walking and talking in the bedroom; that he went into the dining room, and Mrs. Miller was coming out of the bedroom, and defendant came out across the hall through the living room; that this was the bedroom downstairs. "Mrs. Miller said I should keep quiet; they were putting the baby to sleep." He says their faces were flushed, and they acted as though they were a little ashamed.

"I only stayed in the house a short time. The grain was coming. Defendant got in his car and went east, leaving the baby in Mrs. Miller's care. Defendant used to bring the baby up occasionally in the morning. I was generally around then. He would stay a while, and then take the baby home. I talked with defendant at these times on general subjects. In August, saw Mrs. Miller and Gardner together in a car. They were riding along the road west. September 23, defendant came to the house to return a wrench, an automobile tube, and some shells which the baby had taken away. I was plowing, and went to the house, and defendant was there, and came out of the house. No one else there besides Mrs. Miller. Another time, in the fore part of October, I was out in the barn. Defendant drove up, and went into the house and got a pail of water and a dipper. He started to fill the car, and when he got done, Mrs. Miller was standing out on the cement walk near him. He took the dipper and slapped some water on her, and she grabbed the dipper. Then he grabbed her around the waist and tried to get the dipper away from her. I started toward the house, but he stepped on it and went down the road before I could get there. Another circumstance, in October, Mrs. Miller went to Cresco after some cement. We were going to be short, and she brought seven sacks. We unloaded one sack, and went down to the other place. When we came back, she was dusting out the car, and seemed to be a little peeved. Defendant drove in, and remarked that I had no business to draw cement in that car. A few days after the cement transaction, defendant took Blackburn and

wife and Mrs. Miller to town. Blackburn had a camera with a tripod. That was Saturday. Sunday, defendant left the tripod, and said, if he got a bid, he would stay for dinner; and Mrs. Miller asked him to dinner.''

I. We shall take up the question as to the sufficiency of the evidence, and give the substance of all of it. The conviction was had, and must be sustained, if at all, on the testimony of the prosecuting witness, Curtis Miller, alone, or substantially so. One or two other circumstances are relied upon as tending to show adulterous disposition; but without Miller's testimony, there is no case.

Miller's version of the transaction of October 17th is that, about 2:30 o'clock in the afternoon, he went over to grind some feed, just before defendant came to the house.

''He came to where I was grinding. I talked with him, and he went from there toward the house, to look at a Montgomery-Ward catalogue. He said he was looking at the price of scales; that the baby tore the pages out of his catalogue. Only Mrs. Miller was there. Mrs. Miller appeared to be doing some mending. I asked Gardner if he hadn't found the prices of scales; that it was getting late; that I must go out and get the old bay cow. Gardner had been there an hour or two. I went out to the barn, and in a few minutes I went back to the house. I picked up a piece of gas pipe in the engine house; went up across the lawn and into the summer kitchen; and I heard some quick moving, and something give the wall a hard thump, and the reservoir on the stove give a bang. I opened the dining-room door as soon as I could, and Mrs. Miller was sitting down in a wicker chair on the west side of the table, and defendant was sitting over near the east wall of the house on the left side of the table. Mrs. Miller's clothes were down; her bloomers hung over her shoes; and defendant was holding his overalls; and he grabbed this catalogue off the table, and started to work his shirt down into his pants. Mrs. Miller's hair was down, and her face flushed. Defendant did not get up or out of his chair while I was there, nor did Mrs. Miller. She had on a red sweater that she gathered in her left hand. It was twelve feet across the room. They were in the chairs, six or seven feet apart. I only stayed a minute, and went out. This left the two

in the house alone. In a few minutes, Gardner came out to the barn where I was. He asked me if I had a hack saw, and I got it for him, and he stepped up and sawed this pipe off. He said he had been chewing the rag with May, and stayed longer than he intended; got in his car, and went away. I saw him again on the following day; had a talk with him alone. He said he was up to bring back my knife, and that May told him I accused them of wrongdoing. I told him that was true; that he had done all the damage around there that he could; I didn't want to see him around there any more; that Mrs. Miller could do just as she pleased,—move or stay. Then *he calmed down* a little, and said he was sorry; that he couldn't help it; that he always liked May, and asked if anyone had said anything about him being there. I told him I didn't need anybody to tell; that I had seen his car there: and he said he wouldn't come again. He put his hand up to his face, and appeared to be crying. We didn't have a long conversation: most of it was him trying to find out if anybody had been telling me about him. He then took his car and went home, and I did my chores. I have had no conversation with him since that time. In the summer or fall of 1923, I found a collar button in my bed between the sheets. It was not my collar button. I don't know whether it was a man's collar button. I seldom smoke cigarettes; have smoked a few. During the summer of 1923, I often found cigarette stubs in my ash tray on the window sill.''

Some other circumstances are testified to, about defendant's going to the Miller house to borrow a hammer, and bringing it back, and other things borrowed of Miller, and of Miller's going to town with defendant; that at one time he took grist to the mill; that, at another time, they took a lavatory to town, and part of a cistern pump,—and so on.

Cross-examination: ''I was not particularly suspicious about finding the collar button: I knew they had the baby in there to sleep, and might have lost it from him. They use them sometimes. I thought it was funny. I have smoked cigarettes occasionally with defendant and Bilek. On the 17th of October, when I first went in the house, found defendant reading the Montgomery-Ward catalogue, and Mrs. Miller was mending. I had been suspicious a little from the date I

threshed. The second time, I tried to come in as quietly as I could. I didn't go slow. Had no difficulty in opening the dining-room. door. The windows are close to the ground. I could have looked through either of them; could have seen most of the dining room from the east window. When I first saw her, the bloomers were just settling down; her skirt was dragging down over her feet; her legs were still encased in the bloomers. At one time in Cresco, I bought ice cream for my wife, defendant, and his housekeeper."

He denies telling Christianson, about November 5th, that he really didn't think there was anything wrong between his wife and defendant; says that he had a conversation with him before he appeared before the grand jury, and that he does not remember any conversation after that. He denies telling Blackburn and his wife, about November, 1923, that he had heard rumors about his wife and defendant, but didn't think there was anything wrong between them. Christianson and the Blackburns, and perhaps some other witnesses, testify that Miller did so say. This was after the transaction in October now relied on. Another witness testifies that, one time, defendant hit Mrs. Miller on the limb with a fly swatter, when someone else was present.

This is the general tenor of the testimony, and we have been particular in setting out the testimony of the prosecuting witness. The defendant and Mrs. Miller admit some of the other transactions testified to by the State's witnesses, with their explanation thereof; but they deny any wrongdoing on the date upon which the adultery is alleged to have occurred, or at any other time. Mrs. Miller says that it was after 4 o'clock when defendant came to the house, October 17th, to look at a catalogue; that the dining room door was open when Miller came in; that he was there only a few minutes, and did not come back a second time; that there was no noise in the room and nothing out of the ordinary. "My skirts and bloomers were not around my ankles or disarranged. Defendant and Miller went out together, and I didn't see defendant afterwards."

Defendant gave similar testimony, and that he and Miller went from the house to the barn together, and that, when they

were at the barn, they were engaged together in removing a piece of gas pipe from the engine, etc. Defendant sought to show that, in November, Mrs. Miller brought an action for divorce against her husband, the prosecuting witness, and that the original notice was served personally November 13, 1923. The State's objection was sustained. Defendant also offered in evidence the petition for divorce, filed December 7, 1923, wherein Mrs. Miller claimed a divorce on the ground of cruel and inhuman treatment; also, Miller's motion for more specific statement in the divorce case, filed February 26, 1924, objection to which was also sustained. These exhibits are in the record, as is Exhibit No. 1, a stipulation in the divorce case, signed by Miller and his wife, and dated November 13, 1923, wherein they stipulated that the divorce was pending, and for the purpose of settling their property rights it was agreed that, in the event that a divorce was granted, Miller was to pay his wife $12,000 in full payment and settlement of alimony and property rights. She was also to receive household effects which had been gifts to her, a list of which was attached. Miller was to have 80 acres of land, which was therein described. The State's objection to this exhibit was also sustained. We think these exhibits were admissible, as bearing upon the conduct of the prosecuting witness and the proper inferences therefrom. If the story Miller now tells is true, he had, at the date of this stipulation and the divorce proceedings, a defense to the wife's action, or a cause of action in his own favor; but it seems not to have been mentioned. The indictment in this case was returned November 23, 1923.

2. ADULTERY: evidence: files in divorce proceedings.

Several other witnesses testified on both sides as to some minor circumstances; but the foregoing is, for all practical purposes, the case made. We are constrained to hold that the evidence is not sufficient to sustain the conviction. A number of cases are cited by appellant, and the claim is made for them that the evidence therein was more substantial than the evidence in the instant case. While it is true that this court is not the trier of facts, still we have authority to set aside a conviction which is not justified. We recognize the fact, as we have often said, that cases of this kind are difficult to prove, and even more difficult to disprove; that the charge is one easy to make, either

by a designing woman or her husband, if he has some purpose of his own to accomplish. Sometimes circumstances may appear to be suspicious, on the face of it, and yet be entirely innocent. Often trifling circumstances may be magnified and become strong in the estimation of a jealous husband, or one who has some other motive. Some of the circumstances in this case relied upon by the State are natural and harmless, unless a strained or unnatural construction is placed upon them. The conduct of Miller on October 17th, after what he claims he saw and heard, was quite unnatural. His conduct is utterly inconsistent. He and the defendant went out in the barn and worked together, without any accusations of wrongdoing. On the 18th of October, it was the defendant, rather than Miller, who was angry, and calmed down after he had been accused by Miller. These are not the acts of a wronged husband. It would seem that even a spineless jellyfish would make some show of resentment or injured feelings, had he witnessed adultery on the part of his wife, or believed her guilty. It would not do to say that a man and woman may not be together alone as neighbors, without having the name of the woman blackened and the man sent to the penitentiary on mere suspicion. The evidence must be clear, and the crime established beyond a reasonable doubt. The fact of sexual intercourse must be shown circumstantially or otherwise.

Other errors are assigned; but, in the view we take of the case, discussion of them is unnecessary. The judgment is reversed and remanded. Unless there is additional evidence of a substantial character on a retrial, the trial court will dismiss the case.—*Reversed.*

ARTHUR, C. J., and EVANS and FAVILLE, JJ., concur.