IDA MAY MILLER, Appellant, v. CURTIS MILLER, Appellee.

**DIVORCE: Grounds—Imputation of Unchastity.** The act of a husband, 1   for a long series of years, in accusing his wife, without foundation, of unchastity, may furnish ample ground for divorce.

**DIVORCE: Alimony—Interest.** Circumstances may be such as to justify 2   an award of interest on an agreed settlement of alimony long delayed by the wrong of the defendant.

Headnote 1:  19 C. J. p. 51.  Headnote 2:  19 C. J. p. 252 (Anno.)

Headnote 1:  18 L. R. A. (N. S.) 308; 9 R. C. L. 307.

*Appeal from Winneshiek District Court.*—H. E. TAYLOR, Judge.

JANUARY 18, 1927.

REHEARING DENIED JULY 1, 1927.

Action for divorce on the ground of cruel and inhuman treatment. The answer was, in substance, a general denial and a charge of adultery. The district court entered a decree dismissing the petition for want of equity. The plaintiff has appealed.—*Reversed.*

*McCook & Lyons* and *E. R. Acres,* for appellant.

*Joseph Griffin,* for appellee.

EVANS, J.—I. The plaintiff brought her action in November, 1923. Shortly thereafter, the defendant went before the grand jury of his county, and lodged a charge of adultery against one Rupert Gardner, as having been committed with the plaintiff herein. An indictment was returned accordingly. Following this indictment, the proceedings in the divorce case appear to have lain dormant until sometime in the year 1925, when trial was had therein. In the meantime, the criminal case against Gardner was prosecuted, and a verdict and judgment of guilty was entered therein in the district court. On appeal to this court, the judgment was reversed, on the ground of the insufficiency of the evidence, and was remanded. See *State v. Gardner,* 198 Iowa 1308. On the second trial, the defendant was acquitted. The alleged act of adultery charged in such indictment is the same as that charged in the defendant's answer herein. The scope of the evidence, however, is much broader, and the defendant has testified to many events in the married life of the couple, to each of which he attaches the innuendo of criminal guilt.

The parties were married in April, 1899. The defendant was at that time 28 years of age, and had been recently divorced by a former wife for cruel and inhuman treatment. The plaintiff was 19 years of age. They lived in the vicinity of Cresco, though in another county (Winneshiek). Immediately after the marriage, they moved to South Dakota, and remained there for the period of two years. In November, 1900, the plaintiff gave birth to a still-born child. Thereafter, the plaintiff failed

<div style="margin-left:2em; font-size:smaller;">

1. DIVORCE: grounds: imputation of unchastity.

</div>

to recover her strength, and continued as an invalid, comparatively helpless, for the period of about one year or more. For about twelve years thereafter, she suffered considerable ill health. During that period of time, she underwent five surgical operations. They returned from South Dakota back to the old home community in the spring of 1901. Because of the condition of her health, the plaintiff lived for the ensuing summer with her mother, in the town of Cresco, and the defendant lived with his mother on the home farm, which she then owned and occupied, and which later became the home of the parties hereto, where they lived up to the time of their separation, in November, 1923. They moved upon this farm in the spring of 1902. It comprises 480 acres, of which about 200 acres were under the plow. They pursued the ordinary farm operations. Hired men were usually employed, when needed, and occasionally, though rarely, a hired girl. It appears without any dispute that the plaintiff was a very industrious woman throughout her married life, engaging herself not only in the indoor work of the household, but in the outdoor work as well. She often aided her husband in the heavy work in the field, and always in the doing of chores. This latter included the milking of cows, variable in number from a very few to 15 or 20. The farm upon which they lived was located in Winneshiek County, seven miles from Cresco (in Howard County). On the same road, one-half mile away from the residence, the Gardner family lived. This family figures importantly in this record. The head of this family was Zack Gardner, who belonged to the generation of the parents of the defendant. The two families had neighbored intimately for many years, and this intimacy continued throughout the married life of the parties herein. There were five children in the Gardner family, including two sons, Arthur and Rupert. At the time of the marriage of the parties, these two boys were about 14 and 15 years of age. The defendant himself was subject to spells of illness, when he was unable to do his chores. In such an event, Zack Gardner sometimes came over, to do his chores or to help in the doing of them. At other times, he sent the boys over. The road from the Gardner home to the town of Cresco passes by the Miller home. The Millers often rode to town with the Gardners. The defendant employed hired men during the farming season. The great grievance of the plaintiff against the

defendant is that, early in their married life, he put himself in the attitude of suspecting her chastity and of accusing her of sustaining illicit relations with the succession of hired men. There is no doubt, upon this record, but that in his "ugly spells" he invariably called his wife a "whore." His qualified denial of this accusation is that he only said that other people called her a "whore," or would call her so unless she mended her ways. On a few occasions, she rode to Cresco with Zack Gardner, and the defendant accused her of illicit purpose in so doing. In the first year of their life upon the farm, the hired man that summer was Beveridge, a married man. The two couples planned a day's recreation by a fishing trip to the river, 5¾ miles away. On one June day, they carried out the plan. At 11 A. M., they left home in the surrey, provided with a lunch basket and fishing tackle. Arriving at the river, they first lunched. After lunching, they betook themselves down the river in quest of fish, the plaintiff leading in that direction, and becoming separated from the others. Sometime later, when the defendant thought it was time to return home, he claims to have been unable to find his wife or Beveridge. He therefore concluded that they were absenting themselves for illicit reasons, and he drove home with Mrs. Beveridge, leaving Beveridge and the plaintiff undiscovered. It was a very hot day in the summer of 1902, when the plaintiff was not in a good state of health. She walked the whole distance, and arrived home at 5 P. M., which was very shortly after the defendant had arrived home, with his team and surrey. There was no appreciable basis for the defendant's suspicion. He could have found the plaintiff readily, if he had really wanted to do so. She was not with Beveridge, in fact. She was simply a little farther downstream than the rest of them. If the defendant had really believed what he claims to have suspected, then his act in withdrawing from his wife the protection of his presence was a base one. From any point of view, it was not husbandlike. That he did not really believe it is indicated by the fact that he made no complaint to Beveridge, but continued him in his employment, and that he thereafter re-employed him at various times for a period of three years. But to his wife he never apologized for the contemptible act, but attempted always to cover its meanness with accusations against her. This accusation he kept, like

an arrow in his quiver, throughout all the years of their married
life.

In 1907, the plaintiff went to a sanitarium in Prairie du
Chien, intending to take treatment in, the way of baths for a
couple of weeks.  After about ten days, the defendant claims to
have received an anonymous letter, advising him that his wife
was engaged in evil things.  He immediately took a train from
Cresco, and went to Marquette, formerly known as North Mc-
Gregor.  Because it is illustrative of the character of so much of
his evidence as a witness, we incorporate herein a considerable
part of his evidence relating to this subject:

"In June, 1907, she went to Prairie du Chien, to take baths,
or take a rest,—she was getting away from home for a little
while.  When she was down there, I didn't go to Prairie du
Chien; I started for Marquette.  I had been told she had been
staying there at Marquette, and I also had a letter telling me to
come and get her. * * * In response to that letter, I got on the
train and went to North McGregor.  I went to the Depot Hotel
and registered first.  It was about 4 or 4:30 in the evening.  I
went in on a freight train.  From the Depot Hotel I went to the
Annex, to the room, where the rooms were, up some little dis-
tance.  I don't know how far it is.  When I got there, I regis-
tered.  I also see Mrs. Miller and Mrs. Scripture were regis-
tered, as May Miller and Helen Scripture. * * * I went up-
stairs, to go to the room, and when I came to the head of the
stairs,—I think it was to the right when I went up,—in the
room was Mrs. Miller, Mrs. Scripture, and two men,—I don't
know who they were.  They were sitting at a table.  They had
their hands on the table, visiting there.  Leaving then, I went
down to my room.  I didn't speak to them,—don't know whether
they seen me or not.  The only people I knew at that time was
Mrs. Miller and Mrs. Scripture.  I don't know whether it was
the parlor or not; I don't know anything about it; all I see was
those people, sitting around the table. * * * After I saw those
four people, I went to my room that was assigned to me.  Had a
talk with the hotel people later.  After I had been in the room
awhile, I heard them coming, and go in the room.  After a
while, they went out, and after they went out, I stood on the
sidewalk.  They went down to the hotel for supper.  I waited
until after they came out, and I went down and went and

talked with Mr. Berry. * * * Well, I told him these two women were married women, that were registered as girls, as single women,—one of them was my wife. I didn't think they were there for any right purpose. Mr. Berry seemed very angry, himself. He said he had a deal of that kind pulled on him a week or two before; he was going to stop it; he would get. the marshal. I went back, and after a while, they came back and went in the room, and the marshal came up and rapped at Mrs. Miller's room several times. She finally opened the door, and asked him 'What in hell he wanted.' I opened my door when the marshal came up; I looked up, to see what was going on. Well, the marshal—well, he had some argument; he told her that they would have to sleep in the same room that night. After that, Mrs. Scripture came into my room, and put her arm around me, and said she wanted to talk to me. She wanted to know if I thought she was bad, too. * * * I told her it was immaterial in regard to her. I didn't want my wife staying around that way, even if she wasn't a whore,—people would think she was, registering as a single woman and taking single rooms; and she had written me that she would be home that day, and she didn't come. Mrs. Miller was in her room at that time. I sat on the bed, and Mrs. Scripture sat beside me. My room joined Mrs. Miller's, and Mrs. Scripture's room was across the hall. * * * I didn't know Mr. Gilmore at that time. I seen some man in the room,—I didn't know it was Mr. Gilmore. . I seen somebody in the room,—I didn't know what it was. I don't know whether it was Mr. Gilmore in the room, only by hearsay, later. All I know, there were men there,—two men. I didn't see Mr. Gilmore that afternoon or evening in North McGregor or Marquette. I didn't know Mr. Gilmore at that time. Q. Did you or did you not see Mr. Gilmore at Marquette that afternoon or evening? * * * Q. Did you see any man that looked like Gilmore at North McGregor? A. I don't remember. I couldn't see him in the room; he was sitting at the table. I didn't look in the room; I just glanced in, as I went by, and seen two men and two women in the room. I seen the marshal up in the hall. Don't know his name,—never asked him. Saw him in the hall, quite a while later. They had been out to supper, and returned from the hotel. I don't know what time it was,—it was after they had been out to supper. I talked with the marshal up in

the hall. I might have talked with him down below later. I have no recollection whether I talked with the marshal other than in the hall. I know I talked with him up in the hall. I recall meeting the marshal up in the hall, because I recollect his conversation with Mrs. Miller. She asked him 'what in hell he was doing up there.' I opened the door, and heard that. Q. Now, what talk did you have in the hall with the marshal? A. Well, I don't remember the talk I had with him. I don't remember all there was. The marshal told or said that it wasn't the first case he had of that kind up there. He had arrested some fellow there, about a week before, for staying there with a married woman. The marshal told me that. Don't remember what talk I had with him outside the hall. * * * I went down and met the marshal after I went downstairs a few minutes. Met him in front entrance. Had a talk with him,—don't remember what it was about. Q. Was it about your wife? A. I don't remember what we talked about,—might have been about her conduct. Don't remember what the talk was with him; it was a long while ago. I know he was up in the hall, and called her out of the room. I don't know who sent the marshal up to the room,—Mr. Berry, I suppose. I had a talk with Mr. Berry, down in the hotel. Mr. Berry told me he would send the marshal up. He seemed very angry. They weren't in the room, the time I talked with Berry. It was quite a while after I talked with Berry that the marshal came up. I didn't ask the marshal to go. There was no one in Mrs. Miller's room when the marshal came; as far as I know, she was alone. I didn't go in the room, —I seen her come out of the room. Mrs. Scripture came to the room just a few minutes after the marshal came. I was sitting on the bed. I remained sitting on the bed while she remained. I might have sat on a chair some, but I sat on the bed when she came in. I might have sat on the window sill, because I didn't care particularly to have her hug me. She put her arms around me. I was sitting on the bed. She put her arms right around my shoulders. I have know her ever since I had him doctor my wife. I know she was hugging me; there was no mistake about it,—not a bit of a mistake.''

If we take the foregoing evidence at its face value, no other inference would be possible therefrom than that the plaintiff was a very wicked woman, and that her companion, Mrs. Scripture,

was one of like kind. That the foregoing evidence was essentially false is proved beyond fair debate, upon this record. The real facts which we deem proved are that the plaintiff went to the Prairie du Chien sanitarium, in company with Mrs. Zack Gardner. She had been there before, taking the same treatments, on at least two occasions. On one of these occasions, her husband had been there also, taking the same treatments. A few days after her arrival, Mrs. Scripture came, for the same purpose. She was quite ill. She was from Cresco, and was the wife of Dr. Scripture, who had been the physician of the plaintiff, and who had been employed as such physician by the defendant. The plaintiff's mother and her aunts lived at Cresco, and were known to Mrs. Scripture. Although the plaintiff and Mrs. Scripture knew of each other theretofore, they had never before had a speaking acquaintance. They became personally acquainted at this time. On July 2d, the plaintiff prepared to return home. Mrs. Gardner had already returned previously. Against the advice of her local physician, Mrs. Scripture determined that she also would go home with the plaintiff. In the night of July 2d, they took a train that was due to arrive at Marquette (North McGregor) at 8:30 the following morning. While on the train, Mrs. Scripture became very ill. At Marquette, they were due to change cars, in a close connection. When they arrived at Marquette, Mrs. Scripture was unable to proceed. Her attack of illness was of a kind which she had suffered at various times before, and which spent itself in a few hours. They went to a near-by hotel, known in the record as the Annex to the Depot Hotel. Mrs. Scripture was put to bed, and the plaintiff took a room across the hall from hers. Their expectation was that Mrs. Scripture would be able to take the next train for Cresco, which left Marquette about midnight; and this expectation was later fulfilled. The plaintiff immediately took the precaution to telephone to Cresco, advising Dr. Scripture of the situation, and Dr. Scripture met his wife at the train at 4:30 the following morning. Mrs. Scripture was confined to her bed until 3 or 4 o'clock in the afternoon, when she arose, and was dressed. She and the plaintiff thereupon strolled into the parlor on the second floor of the Annex. Sitting at a table in this little parlor was Gilmore, the mayor of the city. He was working upon his official records. This was the room in which and this was the time when the de-

fendant claims to have seen these two women with two men "in a room." Gilmore was called as a witness by the plaintiff; likewise the then marshal, Barton. Gilmore was the only man in the room, unless it be possible that the marshal might have been there a part of the time. Both Gilmore and Barton, as witnesses, unqualifiedly sustain the testimony of both the plaintiff and Mrs. Scripture in this regard. It appears that, a short time before this date, the city hall burned down, and that the proprietor of the hotel had given permission that temporary use could be made of this parlor as a mayor's office. Marshal Barton also, as a witness, denied unqualifiedly the recitals of the defendant as a witness, concerning his alleged action in respect to these two ladies. Except that the defendant himself poured his troubles into the ear of the marshal, he testified that he saw no conduct on the part of either of these ladies that reflected upon their character. It will be seen from the foregoing that the plaintiff did not arrive at Marquette until the early morning of July 3d, and that they had not previously intended to stop there at all. And yet the defendant, in his search, came, not to Prairie du Chien, but to Marquette, to the very hotel at which the plaintiff was stopping. The plaintiff had telephoned full information to Cresco in the early morning, and the inference arises very naturally that it was pursuant to that information that the defendant was able to locate the plaintiff so quickly and so accurately.

The fact that for 18 years the defendant preserved this anonymous letter, and purported to produce it at the trial, has its own suggestiveness as to his mental attitude, and is fairly subject to unfavorable inferences against him. He may have deemed it efficient as an instrument of torture, or he may have preserved it for future use in evidence. On either hypothesis, a mental attitude is indicated which was hostile to the marriage relation, and which would preferably believe the evil, rather than the good, concerning his wife.

We shall not incorporate further evidence, nor dwell upon many further details. In the 16 years following the foregoing event, the married life of these parties was besprinkled with similar accusations by the defendant. In the main, these accusations charged illicit relations with hired men. Few, if any, hired men were omitted from these accusations. Though these accusations were freely made by the defendant to the plaintiff,

herself, they were seldom, if ever, made to the hired men. It does not appear from the record that the defendant ever discharged a hired man on account of such alleged conduct on his part. The charges against the wife were usually based upon nothing more than apparent opportunity, magnified by the living and abiding suspicion of the defendant that his wife's chastity would be impossible if opportunity to the contrary were present. The wrongful acts suspected and charged by him were usually supposed to have been committed in his house while he himself was in and about the same. On one or more occasions, he sought to discover the wrongful act in its commission, and believed himself to have missed his purpose by only the fraction of a second.

The last accusation made by him charged the plaintiff with criminality with Rupert Gardner, who had been a frequent and intimate visitor in this home from early boyhood to the time of the accusation. This accusation was the basis of the indictment to which we have already referred. The record in that prosecution came before us on appeal, whereby we had occasion to consider and analyze the evidence therein. We held it to be clearly insufficient to sustain a verdict of "guilty." Substantially the same evidence offered in support of that indictment was introduced in the instant case. The defendant made some changes in his own evidence, as a witness, but such changes served only to diminish its credibility. For a discussion of that evidence, reference may be had to the opinion in that case (*State v. Gardner*, 198 Iowa 1308).

If we should deem the suspicions and accusations of the defendant trustworthy, then the plaintiff throughout her married life has been a brazen and shameless courtesan, who has devoted herself to the corruption of the young men in the succession of their employment by the defendant. There is no more reason to believe that she has been guilty of one of these accusations than that she has been guilty of all of them. Is it possible that a wife could pursue such a career in a rural community and escape notoriety in that regard? It is not claimed that she had a bad reputation. True, she was vilified, but only by her husband. One might wonder, too, whether such a woman would care to be industrious in her household, or would be willing to milk the cows when her husband was ill.

We hold, upon this record, that the charge of adultery has not been proved, and that the manifold accusations made against the plaintiff throughout their married life have been unwarranted and basely cruel.

She is clearly entitled to a decree, and such will be the order here.

II. Our foregoing conclusion necessitates the consideration of the question of alimony. It appears that, at the time of the institution of the suit, an agreement pertaining to alimony was reached between the parties and reduced to writing, conditioned in the event that a decree of divorce were awarded. This agreement was that the defendant should pay the sum of $12,000, and that the plaintiff should relinquish to the defendant her title held jointly with him to certain of the real estate. This agreement was entered into November 13, 1923. The plaintiff asks that, in the award of alimony at this time, she be allowed interest on such sum. It was after the signing of this agreement that the defendant appeared before the grand jury with his charge of adultery and obtained the indictment. The pendency of the criminal proceeding naturally suspended this one, for the time being. Justice requires, we think, that interest should be allowed on the sum named, unless it be true that temporary alimony has been paid to some extent pending the suit. If any such has been paid, allowance should be made therefor in considering the question of interest. The defendant will be required to pay all costs in both courts. Because of the provisions of the stipulation fixing the amount of alimony, no counsel fees will be allowed to the plaintiff in the taxation of costs. The decree below is accordingly reversed, and the plaintiff may have decree in this court by moving therefor and by tendering performance of conditions of stipulation.—*Reversed.*

2. DIVORCE: alimony: interest.

DE GRAFF, ALBERT, and MORLING, JJ., concur.