ROY D. ARMSTEAD, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

71 N. W. 2d 317

Filed July 15, 1955. No. 33751.

*Kelly & Kelly*, for plaintiff in error.

*Clarence S. Beck*, Attorney General, and *Robert V. Hoagland*, for defendant in error.

Heard before SIMMONS, C. J., CARTER, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ., and FLORY, District Judge.

CHAPPELL, J.

An information, filed June 23, 1954, by the county attorney of Hall County, charged that on or about June 19, 1954, defendant, Roy Armstead, a married man, unlawfully and wrongfully lived and cohabited with a named unmarried woman in a state of adultery. Defendant, when tried to a jury, pleaded not guilty. At conclusion of the State's evidence-in-chief, defendant, reserving his right to introduce evidence in his behalf, moved to dismiss for failure of sufficient proof to estab-

lish a cause of action. The motion was overruled. Again, at conclusion of all the evidence, defendant renewed the motion and it was again overruled. The cause was then submitted to the jury, and it found defendant guilty. Thereafter, his motion for new trial or to dismiss for failure of proof was overruled, and he was sentenced to serve 5 months in the Hall County jail and pay costs. Therefrom he prosecuted error to this court, assigning, insofar as important here, that the verdict was not sustained by sufficient evidence. We sustain the assignment.

Section 28-902, R. R. S. 1943, provides in part: "If * * * any married man shall hereafter commit adultery, or desert his wife and live and cohabit with another woman * * * every person so offending shall upon conviction thereof be imprisoned in the county jail not exceeding one year."

At the outset of the trial, it was stipulated that defendant was a married man having a living wife from whom he was not divorced on June 19, 1954, or prior thereto. Here it will be noted also that at conclusion of the State's evidence, and after it had rested, it was stipulated that defendant's 13-year-old brother, if present and sworn, would testify that prior to the time school was dismissed in May, he stayed weekends in defendant's trailer, and that after school was dismissed, he lived in the trailer with defendant until June 19, 1954, during which time he and defendant occupied the same bed.

The State called four witnesses. All of them were women who lived in the neighborhood of defendant's trailer house, located at 411 North Carey Street in Grand Island, since the spring of 1954. In reciting the incidents hereinafter set forth, such witnesses, with an exception related hereafter, pointed out no specific dates upon which they allegedly occurred.

One such witness, who lived two doors south of defendant's trailer, testified that she never saw defendant's wife there, but she did see defendant and the named

woman around the premises. She saw the woman around there morning and evening. She saw her dressed in jeans, blouse, shirt, or housedress, like any woman does while working in the yard or feeding chickens.

Another witness, who lived across the alley from defendant's trailer, testified that she had seen the woman outside the trailer in the evening feeding some chickens and ducks. One time she had on a housecoat, but at all other times she was dressed like any woman should be when outside. She never saw the woman do any washing, and the only time she saw defendant was at noon when the woman would take him to work. It was not very often that she saw the woman there at night.

Another witness lived in a house rented from defendant's parents until she moved out on June 27, 1954. It was located on a lot next to defendant's trailer. She testified that defendant's parents and the woman were there quite often. At intervals the woman would be gone during the day. Otherwise, she seemed to be there most of the time. She saw her feeding the chickens and ducks, or working in the garden evenings. Much of the time she was dressed in a housedress, skirt and blouse, or jeans and blouse. She saw defendant, the woman, and a truck driver have supper together out in the yard. Once she saw the woman go from the trailer to the basement located right under the witness' kitchen, to answer the telephone, while she was dressed in a house coat. Once she saw her do so while dressed in a slip. She saw defendant and the woman together in defendant's trailer. The back end or bedroom part of defendant's trailer was right opposite the bathroom window of the witness' house. She could look out of her bathroom window and see into the bedroom part of the trailer when the trailer door thereto was open. She could also look out of her kitchen window into defendant's kitchen when the trailer door thereto was open, if she was possessed to do so.

She testified that "On the week end of Memorial week end" about midnight or after, she was awakened by a lot of argument, so she went into her bathroom and looking out the window saw the woman in her underwear in the bedrom part of the trailer. She heard defendant, who was also there, tell the woman that "if she wanted to leave she would have to walk * * *." She said that she did not see any other people around at that time, and that later, when the light went out she still heard them talking. In that regard, we must remember that the bedroom door into the trailer must have then been open, as the witness admitted it was, or she could not have seen them. It seems strange if something were wrong that they would leave the outside bedroom door open. Further, there is no evidence that defendant was not fully dressed at all times, or that the woman did not leave the trailer as she had threatened to do. It is not disputed that the woman actually lived at 405 East Eighth Street in Grand Island. Also, the witness admitted that she had seen defendant's truck driver around the premises at times, and that she had seen defendant's 13-year-old brother there during the daytime after school was out.

The other witness for the State lived one lot distant north from defendant's trailer. She testified that she had seen defendant and the woman around the premises. She had seen them come out of defendant's trailer as early as 6 or 7 a. m. Defendant would leave with a truck and the woman would feed the chickens and ducks, of which they had a large flock. They also had a large garden. The woman was fully dressed at all times except once, when she saw her dressed in a slip. She would drive to and from the premises in her own car, and the witness had seen her with defendant in the car or in a truck, although for some time there was a driver who drove defendant's truck.

On the "day after Memorial, the 31st day of May" the witness and her husband were awakened by screaming

about 12:30 at night, so her husband thought there was somebody coming to the door and he jumped out of bed and ran to the door, but it was the woman and a number of other people, probably having a party. She said the woman was seen "running down the road bawling," and that there were cars running up and down the alley and they did not quiet down until about 4 a. m. It is not clear, except by inference, that such incident was the same one heretofore described by the preceding witness as occurring "on the week end of Memorial week end." If it were the same incident, which seems entirely reasonable, then a number of other people were there at the time, and the woman, it may be inferred, ran down the road and left the premises as she wanted to do, before the lights went out in the trailer. The witness also admitted that she had once seen defendant's 13-year-old brother there after school was out.

Defendant testified in his own behalf, and it was not denied, that he had a 50-50 partnership with the woman in the trucking business. He owned one truck and she owned one. One was registered in his name and one in the name of both of them. The trailer was used as an office. Defendant supervised the trucking operations while the woman answered the telephone, kept all books and records, kept and figured up their accounts at the end of the day, collected all income, and after paying the bills, gave defendant his percentage of the income. He denied that she ever worked in a slip. The telephone was for a time located in the basement next door, with an outside signal bell, but his near neighbor complained of its ringing, and it was moved into the trailer. The woman was required to be in the trailer from early morning until sometimes late in the evening. She fed the chickens because she owned half of them, to be used by her as food during the winter months when the trucking business was slack. While working on a particularly-described job moving dirt for an engineering company, they worked 24 hours a day until someone complained

about the operation and they were required to shut down. Defendant did no driving while living in the trailer, because his license, for some unexplained reason, was suspended for several months. During that period defendant employed a truck driver who lived with him 4 or 5 months and slept in the trailer for some time prior to June 19, 1954. On that date, defendant sent the trucks out to haul dirt and he spent the evening digging a sewer line from his trailer to his parents' house, but found that it was illegal and did not complete the job. Defendant's 13-year-old brother stayed with him some of the time. Defendant testified that he never had intercourse with the woman or at any time ever lived with her or lived in a state of adultery with her. At time of trial he lived in Lexington where he had been working for some time on a gravel job.

The named woman testified as a witness called by defendant. She said she lived at 405 East Eighth Street, Grand Island, and was in the trucking business with defendant. She denied that she had ever lived in a state of adultery with defendant. She denied that she had changed her address to Lexington, but said that she had been down there to see how things were going on.

A mechanic was called as a witness by defendant. He worked on defendant's trucks two or three times a week during May and June, when they came in at night, in order to prepare them for morning work the next day. Sometimes he worked late into the night. He sometimes saw the woman there early in the evening, but never saw her there late at night. A truck driver lived in the trailer with defendant and he would often be seen there. Sometimes he would be in bed in the trailer. The witness sometimes awakened defendant after he was in bed. He also saw defendant's 13-year-old brother there part of the time.

Another witness for defendant was a boyhood friend. He visited with defendant evenings sometimes three or four times a week while defendant lived in the trailer.

He sometimes saw the woman there. She was always fully dressed. Her conduct and that of defendant was only like any other two people would act who were friends.

In Preston v. State, 107 Neb. 307, 185 N. W. 1004, this court said: "We are aware of the rule of this court that it is not necessary, to establish adultery, to have the testimony of a disinterested eye witness. 'Adultery, like any other fact, may be established by circumstantial evidence.' Reinhardt v. State, 101 Neb. 667. In Blue v. State, 86 Neb. 189, this court held: 'Without determining whether in all cases in a prosecution for adultery the unsupported evidence of one of the parties will justify the conviction of the other party when fully and circumstantially contradicted by the defendant and another apparently credible witness, under the circumstances shown in the record in this case, it is held that the wholly unsupported evidence of the complaining witness will not justify the conviction of the defendant.' * * * In connection with the rule quoted from Blue v. State, *supra,* we would go further and hold that mere disposition and opportunity to commit adultery are not alone sufficient to justify a conviction, but there must be circumstances inconsistent with any other reasonable hypothesis. State v. Trachsel, 150 Ia. 135. See, also, State v. Taylor, 160 Ia. 328; State v. Wiltsey, 103 Ia. 54. 'The circumstances must be such as will lead the guarded discretion of a reasonable man to the conclusion that the offense has been committed (here State v. Way, 5 Neb. 283, is cited in the note), and should be so cogent as to exclude every reasonable hypothesis (except that) of guilt. If the facts shown can be reconciled with innocence, they are insufficient to sustain a conviction.' 2 C. J. 22, sec. 44."

In the case at bar, it will be noted that both defendant and the named woman unequivocally denied any adulterous relations, and no fact or circumstance was shown which could not be reconciled with innocence.

In State v. Chaney, 110 Iowa 199, 81 N. W. 454, which presented a comparable situation, the court said: "He flatly denies the charge. There is no fact shown that cannot be reconciled with his innocence. While direct proof of the act of intercourse is not required in cases of this nature, it is necessary that the circumstances shown be inconsistent with innocent conduct. Even in civil cases we have held facts stronger than those here shown to be insufficient to sustain a charge of adultery. Aitchison v. Aitchison, 99 Iowa, 93; Carlisle v. Carlisle, 99 Iowa, 247. We are not inclined to say that defendant may be convicted of a felony upon a showing of facts which would not be enough to establish the charge of adultery in an action for a divorce."

Likewise, in State v. Thompson, 133 Iowa 741, 111 N. W. 319, it is said: "However wicked the heart, the law will not punish save for the overt act, and every citizen, whatever may be his propensities, is presumed to be allegiant to the law until the contrary is made to appear from tangible evidence. We do not say that this offense may not be established by circumstantial evidence, nor that the disposition of the parties accused toward each other and opportunity are not important circumstances to be considered by the jury. Quite the contrary rule has been repeatedly anounced by this court. * * * But the circumstances must be such as will lead the guarded discretion of a reasonable man to the conclusion that the offense has been committed. Whatever the disposition, the mere fact that the parties may have been in each other's company, under such circumstances that the act might have occurred, will not alone justify the conclusion that it actually did. There must be some circumstances, in addition to the disposition and opportunity, tending to rebut the presumption of innocence which continues until overcome by proof."

Also, as said in State v. Trachsel, 150 Iowa 135, 129 N. W. 736: "Conceding that the evidence tended to show an adulterous disposition as between the parties, and a

possibility that they might have had criminal relations on the occasion in question, it did not, we think, show even circumstantially that any criminal act had taken place. Mere disposition and opportunity are not alone sufficient. There must be circumstances inconsistent with any other reasonable hypothesis showing the fact of criminal connection."

In the case at bar there is no evidence whatever of any improper familiarities or that defendant ever in the slightest even caressed the woman involved or demonstrated any affection or desire to have sexual relations with her. There is no such evidence of disposition, and only opportunity appears. Further, there is no evidence that defendant had deserted his wife. Every fact and circumstance adduced by the State and presented by defendant can be reconciled with innocence, and cannot be said to be inconsistent with any other reasonable hypothesis except guilt.

In State v. Gardner, 198 Iowa 1308, 201 N. W. 2, the court said: "While it is true that this court is not the trier of facts, still we have authority to set aside a conviction which is not justified. We recognize the fact, as we have often said, that cases of this kind are difficult to prove, and even more difficult to disprove; that the charge is one easy to make, either by a designing woman or her husband, if he has some purpose of his own to accomplish. Sometimes circumstances may appear to be suspicious, on the face of it, and yet be entirely innocent. Often trifling circumstances may be magnified and become strong in the estimation of a jealous husband, or one who has some other motive. Some of the circumstances in this case relied upon by the State are natural and harmless, unless a strained or unnatural construction is placed upon them. * * * It would not do to say that a man and woman may not be together alone as neighbors, without having the name of the woman blackened and the man sent to the penitentiary on mere suspicion. The evidence must be clear, and the crime established

beyond a reasonable doubt. The fact of sexual intercourse must be shown circumstantially or otherwise."

Finally, in 2 C. J. S., Adultery, § 24, p. 489, it is said: "Adultery may be established by circumstantial evidence, provided the circumstances adduced exclude every other reasonable hypothesis save the guilt of accused, mere suspicion and conjecture being insufficient to sustain a conviction for adultery."

The rules heretofore set forth are controlling here, and for reasons heretofore stated, we conclude that the evidence was insufficient to sustain conviction and sentence of defendant. Therefore, the judgment of the trial court should be and hereby is reversed and the cause is remanded with directions to dismiss the same. All costs are taxed to the State.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.